## Case No. 11,509.

### The QUICKSTEP.

[2 Biss. 291; 2 Chi. Leg. News. 285.] [1]

Circuit Court, D. Indiana. May Term, 1870.

COLLISION—SIGNALS—CHANGE OF SIGNAL—RIVER NAVIGATION—APPEAL.

1. Where in a collision case, the district court had found both parties in fault and divided the

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 2 Chi. Leg. News, 285, contains only a partial report.]

loss, and the respondents only appealed, the libellants are bound by the decree as to the fault on their part, and the circuit court on appeal cannot inquire as to that point. The only subject of inquiry is whether the respondents were in fault.

[See Allen v. Hitch, Case No. 224.]

2. When on the Ohio river an ascending steamer has signaled to pass to starboard, and the descending steamer has accepted the signal, the first is bound to keep to starboard, and if necessary, pass farther to the right than the original course.

3. If the ascending steamer then changes her signal, and the other answers that she will keep her course, the ascending steamer having meanwhile changed her course, and a collision ensuing, is in fault.

[Appeal from the district court of the United States for the district of Indiana.]

This was a libel filed by the owners of the steamer Ollie Sullivan against the steamer Quickstep, for a collision by which, it is alleged, the Ollie Sullivan was sunk in the Ohio river, in consequence of the negligence of those on board the Quickstep in the management of their steamer. The defendant answered denying any negligence, and insisting that the result was caused by the fault of the Sullivan. On the hearing before the district court, both parties were found in fault, and the loss and the costs divided. [Case unreported.]

From this decree the defendant appealed. The libellants did not appeal.

T. A. Hendricks and Asa Iglehart, for libellants.

J. McDonald, for respondent.

DRUMMOND, Circuit Judge. Notwithstanding the general rule that an appeal suspends the decree of the court below, and the cause is heard in this court de novo, and, in certain circumstances, the decree in all its parts may be subject to revision in the circuit court, where the district court has decreed against both parties and only one party appeals; yet, when in such a case as this the libellants were found to be in fault, and a decree for costs rendered against them, and they have taken no appeal, it must be assumed, I think, that they have acquiesced in the decree of the district court, and that it is not open to inquiry in this court whether or not the Ollie Sullivan was in fault. That stands concluded by the decree of the district court. The only subject of inquiry, therefore, in this court, is whether the Quickstep was also in fault, as found in the district court. Stratton v. Jarvis, 8 Pet. [33 U. S.] 4; Houseman v. The North Carolina, 15 Pet. [40 U. S.] 40; Canter v. American Ins. Co., 3 Pet. [28 U. S.] 307; The Water Witch, 1 Black [66 U. S.] 494; Airey v. Merrill [Case No. 115]; Allen v. Hitch [Id. 224]; The Roarer [Id. 11,876].

The Ollie Sullivan, a small, stern-wheel steamboat, about eight o'clock of a dark, windy and rainy night in the month of April, 1869, was descending the river Ohio, on a

trip from Evansville in this state, to enter the mouth of the Wabash river. The boat had just landed on the Indiana shore of the Ohio, a short distance below West Franklin, and almost immediately opposite the upper point of Diamond Island. In backing out from the shore to proceed down the river, the wind made the boat somewhat unmanageable, and it was necessary to back well over to the island before they could take their course down the river. The boat was on her way down the river, heading over towards the Indiana shore north of, and but a short distance from, Diamond Island; how far, is a controverted point in the case.

In the meantime the steamboat Quickstep, a side-wheel boat, was coming up the river, north of, and not far from, the Diamond Island shore. It was a larger, better steamer than the Ollie Sullivan, and more easily managed. Both steamers had lights, but those of the Sullivan were not in the proper place as required by the regulations of the board of supervising inspectors, made under the twenty-ninth section of the act of congress of August 30, 1852 (10 Stat. 72). The pilot of the Quickstep saw the light of the Sullivan, and blew one whistle, which indicated that each was to go to starboard, or the Quickstep on the island side, and the Sullivan on the Indiana side. The Sullivan answered with one whistle, the meaning of which was an assent to that mode of passing. Shortly after—how long is a matter of dispute—the Quickstep blew two whistles, indicating a change in the manner of passing, and the Sullivan again blew one whistle, showing that they adhered to the original purpose, that each should keep the starboard or right hand side. Here the testimony is altogether in conflict. Those on board the Sullivan say that as the Quickstep blew two whistles she began to swing off from the island toward the Indiana shore, and across the course of the Sullivan. Those on board the Quickstep insist that her course was unchanged, and that she stopped the engine and commenced backing at once. As soon as those on the Sullivan heard the two whistles and saw what they supposed was a change of course of the Quickstep, they stopped her engine and commenced backing; but it was all in vain, and the boats came together, the Quickstep striking with her stem the larboard bow of the Sullivan, turning her round with her head up stream, and shortly after she sunk, carrying down some of her passengers, who were drowned.

The question is whether the Quickstep was properly managed. It is difficult to decide how far apart the two steamers were when the first signal was sounded, and what was the interval of time between the first and second signals given by the Quickstep. Those on the Sullivan say the distance was five or six hundred yards; those on the Quickstep, much less. A good deal will depend, also, in deciding the question, upon the distance the Quickstep was from the island shore. Those having charge of her say, it was from forty to sixty yards only; those on the Sullivan, that it was much more. After the Sullivan sunk, her distance from the shore was ascertained, and is given as being measured at one time one hundred and twenty-six feet, and at another one hundred and ninety-three feet. When the collision took place the river was high, and we know that when it was lower than at the time of the collision, steamboats passed, though not at night, between the wreck and the island shore. There is not entire concurrence in the testimony as to the course of the wind. It was probably blowing from the Indiana shore, and somewhat down the river. After the collision the steamers separated, and I think the weight of the evidence is that the Sullivan sunk nearer the shore than she was at the time of the collision.

Why did the Quickstep sound the two whistles for the second signal? It is always a dangerous experiment when two steamers are so near together, to announce one course and then another. It inevitably, under such critical circumstances, leads to difficulty and confusion. It is but fair to examine the reasons given for this conduct by those having charge of the Quickstep. The answer declares that at the time of the second signal the collision was unavoidable, and it was given to save life and property. The testimony of the pilot of the Quickstep, given under the influence of the responsibility resting on him, because he sounded both signals, and the Quickstep was under his immediate management at the time, is, that as he got above Priest's Landing (on Diamond Island), he saw a light, and was uncertain whether it was a steamboat light, and as a precautionary measure he blew one whistle, which was promptly answered by one whistle. He then rung the bell to stop, and then to back, and seeing it was impossible for the steamer to go outside (that is, toward the Indiana shore), and that, by backing the Sullivan might, by possibility, go inside (towards the island), and not do any great damage, he blew two whistles, in order to give the Sullivan that chance. This is the explanation in the answer, and of the principal witness for the claimant. It is to be observed that there does not seem to be any doubt as to the course of the Sullivan immediately before the collision—heading down stream and quartering towards the Indiana shore. The form and depth of the opening made in the Sullivan by the collision, and the manner in which her bow was turned up the river, establish that the Quickstep struck the Sullivan rather a square than a glancing blow, and therefore would indicate some change of course; but however this may be, I think that the Quickstep was in fault in what was done by her when and immediately after the Sullivan was seen. Conceding the statement made by the pilot of the Quickstep when he first saw

the light—that he thought it might be the light of another boat—we must then judge him by his acts. Knowing that it might be a steamer, he must also have known that it was a descending steamer, and therefore it was for him to sound either one or two whistles, to show that he wished to take the right or the left, and it was for the descending steamer to decide. Therefore, when he saw the light, upon the supposition it was that of a steamer, he must have believed he could go to the right, or he would not have blown but one whistle. Now there is no pretense that the Sullivan changed her course till the second signal was given, and it follows that if the pilot of the Quickstep could at the time he gave the first signal, see his way clear to go to the right, every passing instant of time, if the two steamers kept their course, would facilitate the movement, and if the Quickstep gave way to the Sullivan, as the first signal indicated she would if required, then its success was still more assured. Then when in fact the Sullivan, in answer to the first signal, blew one whistle, the pilot of the Quickstep knew that he must keep to the right, that is, the island shore, and should instantly have governed himself accordingly; and if necessary, to avoid meeting the Sullivan, he should have ported his helm and gone nearer to the island shore than he was moving at the time. If this had been done at once, there would have been no collision, and I am satisfied the judgment of the pilot at the time was correct—that he could have gone to the right. I am also of opinion that there was fault in the Quickstep in giving the second signal, and in her action at the time, though it may be difficult to determine precisely how much effect it had in producing the result. When the second signal was given the action of the Sullivan shows that those who managed her thought it safer not to change the original purpose, and that it was some act done by the Quickstep that induced the Sullivan to stop and back after the second signal.

It will be remembered that we are not considering whether the Sullivan was in fault. That, as has been already said, has passed into a decree from which no appeal has been taken, and therefore an omission of a duty required by the sixth rule of the supervising inspectors may be noticed. Diamond Island projects towards the Indiana shore, near Priest's Landing. It is called by some of the witnesses the shoulder of the island. The Quickstep, before the lights of either were seen by the other, was below the shoulder, and the Ollie Sullivan above, and it is probable each was so near the island, that when they were six hundred yards apart they could not be seen in consequence of the bend in the island. Under such circumstances the rule requires that at the distance of six hundred yards from the bend, the pilot of the ascending and descending steamer shall give a signal by a long sound of his steam whistle.

This seems not to have been done by either of these steamers in this case.

In conclusion, I may add that I can have no doubt of the right of the Sullivan under the circumstances, to approach the shore of Diamond Island, as was done at the time. She was not confined to any particular part of the river; all that the law demanded was that she should be managed with due care and skill, and so run on the river as to comply with the rules of navigation when approaching or meeting other craft. The decree of the district court is affirmed.

NOTE. A steamboat which gives a signal to another vessel for a departure from the ordinary rule of navigation, must take the hazard of the consequences of making such departure herself, whether she hears a response to such signal or not. The St. John [Case No. 12,224]. Duty of ascending steamer meeting descending steamer defined. Thorp v. The Defender [Id. 14,003]; Western Ins. Co. v. The Goody Friends [Id. 17,436]; Schenck v. The Fremont [Id. 12,-448]. The respective rights and obligations as to keeping or changing their course, of steamers and sailing vessels examined, and rules stated. The Scotia, 14 Wall. [81 U. S.] 170. And when moving on intersecting lines, at different rates of speed. The Cayuga, Id. 270.